IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN PELLEGRINI o/b/o      :      CIVIL ACTION
ROBERT ANTHONY PELLEGRINI      :
     :
         v.      :
     :
KILOLO KIJAKAZI, Acting      :
Commissioner of Social Security      :      NO.  22-652

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                      September  6, 2023

       Kathleen Pellegrini seeks review of the Commissioner's decision denying her late

husband's application for disability insurance benefits ("DIB").[1]  For the reasons that

follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not

supported by substantial evidence and remand for further proceedings pursuant to

sentence four of 42 U.S.C. § 405(g).

## I.    **PROCEDURAL HISTORY**

       Plaintiff protectively filed for DIB on June 16, 2017, alleging disability as of

September 26, 2016, due to problems with his back, left knee, legs, high cholesterol, high

sugar, kidney stones, depression, anxiety, and sciatica.  Tr. at 87, 173, 226.[2]  Plaintiff's

---

       [1]Kathleen Pellegrini brought this action on behalf of her husband, Robert, who died prior to the commencement of this action.  See Doc. 1; Doc. 10 at 16.  Although Kathleen Pellegrini filed this action, I will refer to Robert Pellegrini as the Plaintiff as he is the individual whose disability application was denied.

       [2]To be entitled to DIB, Plaintiff must establish that he became disabled on or before his date last insured.  20 C.F.R. § 404.131(b).  The record indicates and the ALJ found that Plaintiff was insured through December 31, 2021.  Tr. at 27, 175.

application was denied initially, id. at 92-96, and Plaintiff requested a hearing before an ALJ, id. at 97-98, which was held on January 3, 2019. Id. at 40-73. On February 6, 2019, the ALJ found Plaintiff was not disabled. Id. at 23-34. The Appeals Council denied Plaintiff's request for review on May 6, 2020, id. at 11-13, making the ALJ's February 6, 2019 decision the final decision of the Commissioner. 20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on February 21, 2022, Doc. 1,[3] and the matter is now fully briefed and ripe for review. Docs. 10-11, 14.[4]

## II.   <u>LEGAL STANDARDS</u>

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process, evaluating:

> 1.      Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt.

---

[3]The Appeals Council extended the time within which Plaintiff's counsel could file an appeal in the federal court. Tr. at 1-2.

[4]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). See Standing Order, In RE: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 4.

404, subpt. P, app. 1, which results in a presumption of
disability;

      4.     If the impairment does not meet or equal the
criteria for a listed impairment, whether, despite the severe
impairment, the claimant has the residual functional capacity
("RFC") to perform his past work; and

      5.     If the claimant cannot perform his past work,
then the final step is to determine whether there is other work
in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§§ 404.1520(a)(4).  The claimant bears the burden of proof at steps one through four,

while the burden shifts to the Commissioner at the fifth step to establish that the claimant

is capable of performing other jobs in the local and national economies, in light of his

age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d

88, 92 (3d Cir. 2007).

      The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusion that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," and must be "more than a mere

scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552

(3d Cir. 2005)); see also Biestek v. Berryhill, __ U.S. __, 139 S. Ct. 1148, 1154 (2019)

(substantial evidence "means only – 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305

U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  Schaudeck, 181

F.3d at 431.

III.    **DISCUSSION**

    A.    **ALJ's Findings and Plaintiff's Claims**

The ALJ found that Plaintiff suffered from the severe impairments of mild

degenerative disc disease ("DDD") at L5-S1, small broad-based posterior disc protrusion

at L5-S1, mild bilateral neuroforaminal stenosis at L5-S1, residuals of a left L5-S1

discectomy for a left L5-S1 disc herniation, and residuals of three left knee surgeries.  Tr.

at 27.  The ALJ determined that Plaintiff did not have an impairment or combination of

impairments that met the Listings, id. at 28, and that he retained the RFC to perform

sedentary work with the limitation that he be permitted to alternate sitting and/or standing

for comfort.  Id. at 29.  Based on the testimony of a vocational expert ("VE"), the ALJ

found that, although Plaintiff could not perform any of his past relevant work, he could

perform the jobs of assembler, bench worker, and inspector-sorter.  Id. at 32-33.

Therefore, the ALJ found that Plaintiff was not disabled.  Id. at 34.

Plaintiff claims that the ALJ erred by failing to (1) consider the actual severity of

all of Plaintiff's medically determinable impairments, (2) properly consider the opinion

of Plaintiff's treating physician, and (3) incorporate all of Plaintiff's credibly established

limitations in the hypothetical posed to the VE.  Doc. 10 at 6-16.  Defendant responds

that substantial evidence supports the ALJ's opinion evaluation and RFC assessment.

Doc. 11 at 7-12.  In reply, Plaintiff argues that Defendant misconstrues his severity

argument and that the ALJ's description of Plaintiff's spinal impairments as mild is a mischaracterization of the objective medical evidence.  Doc. 14.

### B.        Plaintiff's Claimed Limitations and Testimony at the Hearing

Plaintiff was born on April 16, 1970, making him 46 years of age at the time of his alleged onset date (September 26, 2016), and 48 years of age at the time of the ALJ's decision denying him benefits (February 6, 2019).  Tr. at 87, 173.  He completed high school and dropped out of college after his first year, and has a CDL driver's license.  Id. at 46, 227.  He has past relevant work as a shipping and receiving clerk, baker, swimming pool technician, finish carpenter, and a carpet seller/installer.  Id. at 46-49, 69-70, 228.

At the administrative hearing, Plaintiff explained that he stopped working on September 26, 2016, due to a back injury causing severe pain.  Tr. at 50-51.  He testified that injections "really did nothing" and chiropractic treatments did not help with the pain. Id. at 62-63.  Plaintiff underwent back surgery in December of 2016, followed by physical therapy, and testified that the surgery reduced his sciatic pain by 40-50 percent. Id. at 53.  According to Plaintiff's testimony, when the back pain continued, his doctors wanted to do a spinal fusion, but he was hesitant because the doctors could not tell him the percentage of relief surgery would produce.  Id. at 51.  At the time of the administrative hearing, Plaintiff was taking doxepin for depression and to aid sleep, Lunesta to aid sleep, diclofenac, gabapentin, and tizanidine for pain, and hydrocodone when the pain is very bad because hydrocodone makes him sick.  Id. at 51-52, 66.[5]

---

[5]Doxepin is used to treat symptoms of depression, anxiety and insomnia.  See https://www.drugs.com/mtm/doxepin-capsules-oral-concentrate.html (last visited Aug.

Plaintiff described his back pain as "short burning" pain in the lower left side above his left buttock that goes down the left leg. Id. at 54-55. Plaintiff testified that any sort of activity makes the pain worse, including sitting for long periods of time, walking any distance, and picking up anything. Id. at 55. On a good day he could walk half a mile and stand for twenty minutes to half an hour. Id. He can bend if he does it carefully, and stooping or squatting "hurts really bad." Id. Plaintiff estimated that he could lift ten pounds, and could sit for fifteen to twenty minutes "without having to get up and down." Id. Plaintiff testified that sitting in his recliner is the only thing that gives him any relief, bringing the pain down to a 5 out of 10. Id. at 54.

At the time of the administrative hearing, in addition to Plaintiff's back problems, he had been suffering with kidney stones for the prior six months, had a history of left knee problems and surgeries, and had part of his small intestine removed. Tr. at 64-65. Plaintiff also testified that he had concentration problems because he cannot get comfortable, is constantly fidgeting, and his medication causes him to be sleepy and dizzy. Id. at 67.

The VE classified each of Plaintiff's prior jobs according to exertional level: shipping/receiving clerk, swimming pool technician, and finish carpenter were classified

---

30, 2023). Lunesta is a sedative used to treat insomnia. See https://www.drugs.com/lunesta.html (last visited Aug. 30, 2023). Diclofenac (brand name Voltaren) is a nonsteroidal anti-inflammatory drug ("NSAID") used to treat mild to moderate pain. See https://www.drugs.com/diclofenac.html (last visited Aug. 30, 2023). Gabapentin is used to trat nerve pain. See https://www.drugs.com/gabapentin.html (last visited Aug. 30, 2023). Tizanidine is a short-acting muscle relaxer. See https://www.drugs.com/tizanidine.html (last visited Aug. 30, 2023). Hydrocodone is an opioid pain medication. See https://www.drugs.com/hydrocodone.html (last visited Aug. 30, 2023).

as medium level jobs, but as Plaintiff performed them, they were heavy; and his jobs as a baker and carpet layer were classified as heavy, but as he performed them, the jobs were heavy to very heavy.  Tr. at 69-70.  The ALJ asked the VE to consider someone of Plaintiff's age, education, and work experience, who could perform sedentary work that would permit him to alternately sit and stand for comfort during an eight-hour workday.  Id. at 70.  The VE testified that such a person could not perform any of Plaintiff's past relevant work, but could perform the jobs of assembler, inspector sorter, and bench worker.  Id. at 70-71.  When the ALJ added the limitations that the person could sit for two hours, stand and walk for two hours, and rarely lift less than ten pounds, the VE said that the description was not consistent with any fulltime competitive employment.  Id. at 71.  In response to Plaintiff's counsel's questions, the VE testified that if the person either was off task for twenty-five percent of the time or would miss four days of work a month, he would not be able to sustain work.  Id.

**C.    Summary of the Medical Record**[6]

Plaintiff has a history of back problems.  An MRI from August 19, 2013, revealed mild DDD at L5-S1 and a "small broad-based posterior . . . disc protrusion," and "[t]here are mild bilateral neuroforaminal stenoses . . . secondary to mild disc space narrowing."[7]

---

[6]Plaintiff's claims and the review of the record focus on his physical impairments.

[7]A disc protrusion is the herniation of an intervertebral disc.  Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD"), at 1538.  Spinal stenosis is "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space; symptoms are caused by compression of the cauda equina (nerve roots at the bottom of the spine) and include pain, paresthesias, and neurogenic claudication."  Id. at 1770.

Tr. at 290; see also id. at 282.  On September 26, 2016, while lifting a 100 pound box at work, Plaintiff "felt a 'pop' in his lower back" and felt "excruciating pain" the next day at work.  See id. at 322.  When Plaintiff was seen by Gerry Rosales, Jr., M.D., of St. Mary Physician Group on September 28, 2016, Plaintiff complained of sharp pain in his lower back with tightness and spasms.  Id. at 351.  The doctor noted tenderness in the lumbar spine, decreased sensation of the lower left leg, and positive straight leg raising tests ("SLR") on both sides.[8]  Id. at 352.  Dr. Rosales continued Plaintiff on metaxalone, prescribed a short course of prednisone, and referred him to an orthopedic specialist.[9]  Id.

On October 5, 2016, Plaintiff began treatment with Michael Mehnert, M.D., of the Rothman Institute.  Tr. at 430, 609.  The doctor noted tenderness in the lumbar area and over the left sciatic notch, and that Plaintiff had difficulty standing up straight due to left leg radicular pain and had limited range of motion.  Id.  at 430-31, 609-10.  The doctor prescribed tramadol and Flexeril, and requested an MRI.[10]  Id. at 431, 610.

---

[8]The Lasegue test, also known as the SLR, checks for impingement of the nerves in the lower back by determining whether there is pain when "the symptomatic leg is lifted with the knee fully extended; pain in the lower extremity between 30 and 90 degrees of elevation indicates lumbar radiculopathy, with the distribution of the pain indicating the nerve root involved."  DIMD at 1893, 1900.

[9]Metaxalone is a muscle relaxant.  See https://www.drugs.com/mtm/metaxalone.html (last visited Aug. 30, 2023).  Prednisone is a corticosteroid used to decrease inflammation.  See https://www.drugs.com/prednisone.html (last visited Aug. 30, 2023).

[10]Tramadol is a synthetic opioid used to treat moderate to severe pain that is not being relieved by other types of pain medicines.  See https://www.drugs.com/tramadol.html (last visited Aug. 30, 2023).  Flexeril is a muscle relaxant.  See https://www.drugs.com/flexeril.html (last visited Aug. 30, 2023).

An MRI performed on October 10, 2016, revealed a "small to moderate-sized central disc protrusion" with "minimal central canal stenosis" and "mild to moderate right neural foraminal narrowing" at L4-5. Tr. at 310, 311-12, 643; see also id. at 428 (Dr. Mehnert's review of the MRI). At L5-S1, the MRI revealed a "[d]iffuse disc bulge and a small broad-based central inferior disc extrusion which contacts the descending right S1 nerve root, [and] moderate left and mild to moderate right neural foraminal narrowing." Id. at 643; see also id. at 311, 428 (Dr. Mehnert's review of the MRI).[11]  The same day, he saw Dr. Mehnert, who ordered physical therapy and scheduled Plaintiff for a left-sided L5-S1 interlaminar epidural steroid injection. Id. at 428-29, 606-07.

Dr. Pfeifer performed the epidural injection on October 14, 2016, and it helped Plaintiff's left leg pain, but his back and buttock pain persisted at 7/10. See id. at 425. When Plaintiff saw Dr. Mehnert on October 28, 2016, the doctor discontinued physical

---

[11]A disc bulge is distinguished from a disc herniation as follows:

> Disks [are] composed of an outer layer of tough cartilage that surrounds softer cartilage in the center. . . . [C]hanges [in the disk] can cause the outer layer of the disk to bulge out fairly evenly all the way around its circumference. . . . Only the outer layer of tough cartilage is involved [with a bulging disk].
>
> A herniated disk . . . results when a crack in the tough outer layer of cartilage allows some of the softer inner cartilage to protrude out of the disk. . . .
>
> Compared with a bulging disk, a herniated disk is more likely to cause pain because it generally protrudes farther and is more likely to irritate nerve roots.

See https://www.mayoclinic.org/diseases-conditions/herniated-disk/expert-answers/bulging-disk/faq-20058428 (last visited Aug. 29, 2023).

therapy, scheduled a repeat epidural injection, and prescribed Lyrica.[12]  Id.  On

November 1, 2016, Dr. Mehnert performed a left L5-S1 transforaminal epidural injection.

Id. at 423, 448.  On November 3, 2016, with no relief, Dr. Mehnert referred Plaintiff to

Victor Hsu, M.D., for a surgical consult.  Id. at 422.  On November 17, 2016, Dr. Hsu

diagnosed lumbar DDD and a disc herniation at L5-S1and recommended a

microdiscectomy at L5-S1 to relieve the leg pain.[13]  Id. at 420, 603-05.

On November 28, 2016, Plaintiff returned to Dr. Rosales for preoperative

evaluation in preparation for a left L5-S1 lumbar discectomy.  Tr. at 355.  On December

6, 2016, Victor Hsu, M.D., performed a left L5-S1 discectomy.  Id. at 370-71, 442-43.

Two weeks later, Dr. Hsu noted that Plaintiff reported that his legs felt good, but he had

"a lot of back pain."  Id. at 415.  Dr. Hsu prescribed Norco and Valium.[14]  Id.

On January 19, 2017, Dr. Hsu noted compete resolution of Plaintiff's leg pain, but

recurrence of his back pain, and recommended physical therapy.  Tr. at 413.  Despite

noting resolution of Plaintiff's leg pain, the doctor also noted that Plaintiff reported that

---

[12]Lyrica is an anticonvulsant used to treat nerve pain.  See
https://www.drugs.com/lyrica.html (last visited Aug. 30, 2023).

[13]A discectomy "is surgery to remove the damaged part of a disk in the spine that
has its soft center pushing out through the tough outer lining."  See
https://www.mayoclinic.org/tests-procedures/diskectomy/about/pac-20393837 (last
visited Aug. 30, 2023).

[14]Norco contains a combination of hydrocodone and acetaminophen, a less potent
pain reliever than hydrocodone, that increases the effects of hydrocodone.  See
https://www.drugs.com/norco.html (last visited Aug. 30, 2023).  Valium is a
benzodiazepine used to treat anxiety disorders and is used with other medications to treat
muscle spasms, stiffness, and seizures.  See https://www.drugs.com/valium.html (last
visited Aug. 30, 2023).

his preoperative back pain and left leg pain had returned, but the numbness in his left foot had resolved.  Id.  SLRs were positive bilaterally.  Id.

On January 24, 2017, Plaintiff began treating with Nirav Shah, M.D., at Princeton Brain and Spine.  Tr. at 483-85.  Plaintiff explained to Dr. Shah that, after the surgery, the sciatica was 80% better, but the original back pain continued with numbness in his left leg at times.  Id. at 483.  Dr. Shah noted muscle spasms on the left side of the lower back and difficulty ambulating, but bilateral SLRs were negative.  Id. at 484.  Dr. Shah agreed with Dr. Hsu that Plaintiff would benefit from physical therapy.  Id. at 485.  On March 3, 2017, Plaintiff followed up with Princeton Brain and Spine with continuing complaints of back pain radiating into his left leg.  Id. at 480.  Physicians' assistant ("PA") Susan Beckman ordered an MRI.  Id. at 481.  When Plaintiff followed up with Dr. Shah on April 25, 2017, the doctor noted sacroiliac tenderness on the left side, and a positive SLR. Id. at 478.  Dr. Shah indicated that Plaintiff's options were lumbar fusion surgery, continued conservative measures, or spinal cord stimulation.  Id. at 479.  The doctor did not believe continued conservative measures were a viable option.  Id.

On March 6, 2017, Plaintiff began treatment with Avidon Appel, D.O., for back pain.  Tr. at 472-75.  The doctor noted limited range of motion in the lumbar spine and a positive SLR.  Id. at 474.  Dr. Appel prescribed gabapentin, nabumetone, carisoprodol, Voltaren, doxepin, and physical therapy.[15]  Id. at 475.  On March 28, 2017, Plaintiff saw

---

[15]Nabumetone is an NSAID used to reduce inflammation.  See https://www.drugs.com/mtm/nabumetone.html (last visited Aug. 30, 2023).  Carisoprodol is a muscle relaxer.  See https://www.drugs.com/carisoprodol.html (last visited Aug. 30, 2023).

Dr. Appel in follow up, reporting lower back pain radiating into his left leg at 7/10 and muscle spasms.  Id. at 470.  Dr. Appel again noted limited range of motion of the lumbar spine and a positive SLR.  Id. at 471.  The doctor prescribed diclofenac, baclofen, Valium, increased gabapentin, and continued Plaintiff's use of Voltaren and continued physical therapy.[16]  Id.  On August 28, 2017, Plaintiff complained of limited joint mobility, joint pain, back pain and difficulty walking.  Id. at 620.  Dr. Appel's musculoskeletal examination was "grossly normal."  Id. at 621.  Plaintiff continued treatment with Dr. Appel through October 26, 2018.  Id. at 623-25 (9/19/17), 626-28 (2/2/18), 629-31 (4/19/18), 632-34 (10/26/18).  On February 2, 2018, the doctor added tizanidine and etodolac to Plaintiff's medication regimen.[17]  Id. at 628.

On December 20, 2018, Dr. Appel completed Medical Source Statement, in which he indicated that Plaintiff suffers from low back pain with radiculopathy into the legs, which occurs every day for most of the day.  Tr. at 667.  The doctor indicated that Plaintiff had reduced range of motion, abnormal gait, tenderness, muscle spasm, and positive SLRs.  Id. at 667-68.  Dr. Appel opined that Plaintiff could rarely lift less than 10 pounds, could walk half a block, sit for 2 hours a day in 10-15 minute increments, stand/walk for two hours a day in 15-20 minute increments, and required the ability to shift at will from sitting, standing, or walking.  Id. at 668-69.  In addition, Dr. Appel

---

[16]Baclofen, an antispasmodic agent, acts on spinal cord nerves and decreases the number and severity of muscle spasms.  See https://www.drugs.com/baclofen.html (last visited Aug. 30, 2023).

[17]Etodolac is an NSAID used to treat mild to moderate pain.  See https://www.drugs.com/etodolac.html (last visited Aug. 30, 2023).

opined that Plaintiff should never twist, stoop, crouch, or climb ladders, and rarely climb stairs, and will need to take unscheduled breaks every 30-45 minutes for 10-15 minutes and should elevate his legs with prolonged sitting.  Id. at 669.  The doctor also opined that Plaintiff would be off task 25% or more and would miss more than four days of work per month.  Id. at 670.

Plaintiff began chiropractic care with Matthew Tischler, D.C., on February 20, 2017, and treated approximately three times a week through May 3, 2017.  Tr. at  501-50. Dr. Tischler noted a positive SLR on the left and reduced range of motion of the lumbar spine.  Id. at 549.

On December 18, 2017, Plaintiff began treatment for low back pain and left leg pain with Kenneth Lingenfelter, D.O., at Pennsylvania Orthopedic Associates.  Tr. at 590-92, 614-16, 639-41.  On examination, Dr. Lingenfelter noted mild weakness of the lower left leg and decreased range of motion of the lumbar spine.  Id. at 591, 615, 640. The doctor reviewed the October 9, 2016 MRI and a postoperative March 2017 MRI showing "broad-based disc protrusion herniation at L4-5 with [DDD] and facet arthrosis, mild spinal stenosis at this level."  Id.   At L5-S1, the doctor noted that the preoperative disc herniation was decreased in size in the postoperative MRI, with moderate foraminal stenosis bilateral, and moderate to severe foraminal stenosis on the left side.  Id.  In addition, the doctor noted "[s]ignificant DDD at L5-S1."  Id.  The doctor ordered a new MRI, CT scan, and EMG of the lower extremities.  Id. at 592, 616, 641.

The ordered tests were all obtained in January 2018.  The CT scan revealed mild disc narrowing and a "[b]road-based slight bulge" at L5-S1, and four kidney stones on

the left and two on the right.  Tr.  at 595, 644.  The CT scan also showed "[s]tenosis of the left L5-S1 foramen from a combination of slight spur, disc protrusion, and postoperative tissue [causing] impingement on the exiting left L5 nerve."  Id. at 596, 645. The MRI showed fibrosis at L5-S1,[18] with a small amount "adjacent to the left S1 nerve root origin," and indicated that "[t]he combination of fibrosis and disc/osteophyte complex results in moderate left foraminal narrowing and some mass effect upon the exiting left L5 nerve root."  Id. at 597, 646.  In addition, at L4-5, there was mild DDD, and a "[s]mall broad-based central disc protrusion, which slightly compresses the anterior thecal sac."  Id. at 597-98, 646-47.  The EMG study was normal.  Id. at 577, 600, 649. On January 29, 2018, when Plaintiff returned to Dr. Lingenfelter, the doctor again noted decreased range of motion of the lumbar spine and mild weakness of the left leg.  Id. at 577, 588, 637.  The doctor reviewed the new studies and recommended lumbar fusion and facetectomy at L5-S1, and lumbar fusion at L4-5.  Id. at 577-78, 588-89, 637-38.

Plaintiff also has a history of kidney stones.  On March 29, 2015, a CT scan revealed "[a] few small nonobstructing bilateral renal stones," a left renal cyst, and a .5-cm calculus" in the left ureter.  Tr. at 293; see also id. at 300.  A July 17, 2018 diagnostic imaging report showed a 1.3 cm calculus in the left kidney and a 1.2 cm cyst.  Id. at 584. In addition, as previously mentioned, a CT scan performed on January 9, 2018, revealed nonobstructing kidney stones, 4 on the left and 2 on the right, all smaller than 5 mm.  Id. at 644.

---

[18]Fibrosis is the formation of fibrous tissue.  DIMD at 704.

On August 30, 2017, David Dzurinko, M.D., conducted a consultative examination, during which the doctor noted SLR was negative bilaterally, but Plaintiff had pain in the left leg toward the hip and buttocks, which did not radiate into the lower leg.  Tr. at 564.  Dr. Dzurinko noted limited range of motion in Plaintiff's knees, hips, and lumbar spine.  Id. at 572-73.  The doctor found that Plaintiff could frequently lift and carry up to 20 pounds, occasionally lift and carry 50 pounds; sit for 30 minute intervals for a total of 4 hours a day; stand for 20 minute intervals for 4 hours a day, and walk for 10 minute intervals for 4 hours a day.  Id. at 566-67.  Additionally, he found that Plaintiff could occasionally climb stairs and ramps, balance, stoop, and crouch and never climb ladders or scaffolds, kneel, or crawl.  Id. at 569.  Dr. Dzurinko also indicated that Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces, use public transportation, or climb a few steps with the use of a handrail.  Id. at 571.

On October 4, 2017, at the initial consideration stage, Chevaughn Daniel, M.D., found from a review of the record that Plaintiff could frequently lift/carry 10 pounds, occasionally lift/carry 20 pounds, stand and/or walk 6 hours and sit for 6 hours in an 8 hour day.  Tr. at 82-83.

### D.   Plaintiff's Claims

#### 1.   Mischaracterization of the Severity of Plaintiff's Impairments

Plaintiff first complains that the ALJ mischaracterized the severity of his impairments.  "Severity" is a term of art in the realm of social security disability.  At the second step of the sequential evaluation, called the severity step, the ALJ must determine if the claimant has a severe impairment or combination of impairments that limits his or

her ability to perform basic work activities.  20 C.F.R. § 404.1521(a).  Severe for
purposes of the second step is "more than a 'slight abnormality.'"  Magwood v. Comm'r
of Soc. Sec., 417 F. App'x 130, 132 (3d Cir. 2008) (quoting Newell v. Comm'r of Soc.
Sec., 347 F.3d 541, 546 (3d Cir. 2003); McCrea v. Comm'r of Soc. Sec., 370 F.3d 357,
362 (3d Cir. 2003)).

In his Findings of Fact and Conclusions of Law, the ALJ found that Plaintiff had
the "severe impairments" of "Mild [DDD] at L5-S1, Small Broad-Based Posterior Disc
Protrusion at L5-S1, Mild Bilateral Neuroforaminal Stenosis at L5-S1, Residuals of a
Left L5-S1 Discectomy for a Left L5-S1 Disc Herniation, and Residuals of Three Left
Knee Surgeries."  Tr. at 27 (emphasis added).  Plaintiff argues that the ALJ has
mischaracterized the evidence in finding mild DDD, mild neuroforaminal stenosis, and a
small disc protrusion at L5-S1.  Doc. 10 at 6-8.  Plaintiff essentially complains that the
ALJ failed to consider the "severity" -- in the colloquial sense[19] -- of Plaintiff's
medically determinable impairments.  Id.  Defendant responds that Plaintiff cannot
demonstrate any harmful error because the ALJ proceeded beyond the second step of the
sequential evaluation and accounted for Plaintiff's lumbar spine limitations in his RFC
assessment.  Doc. 11 at 5-6.

---

[19]The dictionary definition of "severity" is "the  quality or state of being severe;
the condition of being very bad, serious, unpleasant or harsh."  See https://www.merriam-webster.com/dictionary/severity#:~:text=%3A%20the%20quality%20or%20state%20of,illness%20and%20lessen%20its%20severity (last visited Aug. 24, 2023).

Setting aside the semantics of Plaintiff's argument,[20] the failure to find an impairment severe at the second step of the sequential evaluation is harmless provided the ALJ determines that one of the claimant's impairments is severe because the ALJ is required to consider the impact of both severe and non-severe impairments when assessing a claimant's RFC.  See Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 144-45 & n.2 (3d Cir. 2007) ("Because the ALJ found in [the claimant's] favor at Step Two, even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless.") (citing Rutherford, 399 F.3d at 553); see also 20 C.F.R. § 404.1523(c) ("we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity").  While Plaintiff claims mischaracterization, rather than omission, of Plaintiff's severe conditions, the same logic applies.  Provided the ALJ has properly considered the evidence and addressed the limitations imposed by all of Plaintiff's impairments in the RFC assessment, the mischaracterization would be harmless.

In determining the claimant's RFC,

> the ALJ must consider all evidence before him.  Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence.  In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.

---

[20]The ALJ clearly understood the difference between the descriptive terms "mild" and "small," and the specialized meaning of the term "severe."  Indeed, without an understanding of the definition of "severe" for purposes of the second step of the sequential evaluation, the ALJ's finding that Plaintiff's "Mild [DDD]" is a severe impairment would be nonsensical.

17

Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (internal quotation omitted) (citing Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999); Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986); Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)). Here, I agree with Plaintiff that the ALJ failed to consider probative evidence, leaving the court to guess whether the ALJ rejected or overlooked the evidence, and will remand the case for further consideration.

As noted in the review of the medical evidence, Plaintiff has a history of lumbar pain and has had numerous MRIs of his lumbar spine. The August 19, 2013 MRI, three years prior to Plaintiff's alleged onset date, revealed mild DDD, a "small broad-based posterior . . . disc protrusion," and "mild bilateral neuroforaminal stenosis . . . secondary to mild disc space narrowing," all at the L5-S1 level. Tr. at 290. The October 10, 2016 MRI, taken after Plaintiff injured his back at work, revealed "mild [DDD] . . . at L5/S1," with a "diffuse disc bulge and a small broad-based central inferior disc extrusion which contacts the descending right S1 nerve root," and "moderate left and mild to moderate right neural foraminal narrowing." Id. at 310. At L4-5, this MRI also showed "a small to moderate-sized central disc protrusion," "minimal central canal stenosis," and "mild to moderate right neural foraminal narrowing." Id. On March 20, 2017, three months after Plaintiff's L5-S1 discectomy, an MRI revealed postsurgical changes at L5-S1 with disc desiccation and mild disc space narrowing, and a "[m]inor disc bulge with tiny central disc herniation, protrusion type and tiny posterior annular tear" at L4-5. Id. at 648. Finally, on January 8, 2018, the MRI revealed a "combination of fibrosis and

disc/osteophyte complex result[ing i]n moderate left foraminal narrowing and some mass effect upon the exiting left L5 nerve root," and "[t]he right L5 foramen appears mildly to moderately narrowed and may slightly impinge on the exiting nerve root" at L5-S1.  Id. at 597, 646.  Additionally, at L4-5, there was mild DDD, and a small broad-based central disc protrusion "which slightly compresses the anterior thecal sac."  Id. at 597-98, 646-47.

With respect to the ALJ's consideration of the MRI evidence, first, I note that the ALJ's decision is internally inconsistent.  At step two, the ALJ indicated that Plaintiff suffered from "mild" stenosis at L5-S1.  Tr. at 27.  However, in reviewing the MRI results, the ALJ stated that the January 2018 MRI revealed "recurrent and severe spinal stenosis," which is a quotation of Dr. Lingenfelter's review of the January 2018 imaging studies.  Id. at 31 (citing id. at 577).  Considering that the ALJ characterized Plaintiff's stenosis as mild in his own findings, but recited Dr. Lingenfelter's assessment that Plaintiff suffered from "recurrent and severe spinal stenosis," it is unclear which conclusion the ALJ adopted in crafting the RFC assessment.

More concerning, however, as Plaintiff argues in his opening and reply briefs, see Doc. 10 at 6-8 & n.2; Doc. 14 at 1-2, is the ALJ's failure to acknowledge other observations contained in the January 2018 MRI report and CT scan.  Although the ALJ mentioned the January 2018 testing and referred to some of the specific findings, tr. at 31, the ALJ neglected to mention other (more significant) findings in the two reports.  As just noted, the MRI report states that fibrosis (scar tissue) and disc osteophyte complex result in "some mass effect upon the exiting left L5 nerve root."  Id. at 598, 647.  Additionally,

the CT scan showed "[s]tenosis of the left L5-S1 foramen from a combination of slight spur, disc protrusion, and postoperative tissue [causing] impingement on the exiting left L5 nerve." Id. at 596, 645. It is unclear if the ALJ considered this evidence but rejected it or instead overlooked this probative finding. Similarly, although the ALJ acknowledged a "central disc protrusion and small herniation at L4-5," id. at 31, the ALJ failed to note that the disc protrusion "slightly compresses the anterior thecal sac," id. at 597-98, 646-647, and that the right L5 foramen "may slightly impinge on the exiting nerve root" at L5-S1. Id. at 597, 646. Again, it is unclear if the ALJ considered this evidence in determining Plaintiff's RFC. Without any acknowledgement of this evidence, the court is unable to determine whether the ALJ considered and rejected this evidence or overlooked it, contrary to the Third Circuit's requirement in Burnett. 220 F.3d at 121. On remand, the ALJ shall re-evaluate the objective medical testing/findings and evidence relating to Plaintiff's spinal impairments, explaining the consideration given to the impingement/compression evidence contained in the January 2018 MRI and CT scan.

    2.    <u>Other claims</u>

In his second and third claims, Plaintiff complains that the ALJ rejected Dr. Appel's assessment for erroneous reasons and failed to incorporate all of Plaintiff's credibly established limitations in the RFC assessment and hypothetical questions posed to the VE. Doc. 10 at 8-16. Having determined that the case must be remanded for further consideration of the objective medical evidence relating to Plaintiff's spinal impairments, I have no need to address the additional issues at this time because

reconsideration of the evidence may affect the ALJ's consideration of Dr. Appel's assessment and alter the RFC assessment.

I observe that the ALJ concluded that Dr. Appel's assessment was not supported by Dr. Lingenfelter's objective findings at Pennsylvania Orthopedic Associates.  Tr. at 32.  However, earlier in his decision, the ALJ noted that December 2017 and January 2018 examinations by Dr. Lingenfelter revealed "a decreased range of motion of the lumbar spine in all directions, pain with all directions, increased pain with extension as compared to forward flexion, . . . mild weakness . . . of the left lower extremity. . . and [that Plaintiff] was slow to arise from a seated position."  Id. at 31 (citing id. at 576-78, 636-38 (1/29/18 treatment note); 614-16, 639-41 (12/18/17 treatment note)).  In addition, after reviewing the January 2018 CT scan and MRI, Dr. Lingenfelter recommended lumbar fusion and facetectomy at L5-S1, and lumbar fusion at L4-5.  Id. at 577-78, 637-38.  On remand, the ALJ shall specifically address the consistency or lack thereof between Dr. Lingenfelter's objective findings, the January 2018 MRI and CT scan findings, and Dr. Appel's assessment.  See 20 C.F.R. § 404.1520c(c)(2) ("The more consistent a medical opinion(s) . . .  is with the evidence from other medical sources . . . , the more persuasive the medical opinion(s) . . . will be.").

## IV.   __CONCLUSION__

The ALJ's decision is not supported by substantial evidence because it failed to adequately explain the ALJ's consideration of findings in the January 2018 MRI and CT scan.  Reconsideration of the medical evidence regarding Plaintiff's spinal impairments may affect the ALJ's consideration of Dr. Appel's opinions and the RFC assessment.

An appropriate Order follows.